UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

IDLE MEDIA, INC. and THE DISPENSARY, LLC,

Plaintiffs,

-against-

CREATE MUSIC GROUP, INC. and KYLE REILLY,

Defendants.

Case No. 24-cv-00805 (JLR)

**OPINION AND ORDER**

JENNIFER L. ROCHON, United States District Judge:

This case involves a dispute concerning allegedly overdue royalty payments associated with the distribution of sound recordings on various digital-streaming platforms. A licensing agreement entered in 2017 between Idle Media, Inc. ("Idle"), a Nevada corporation with its principal place of business in Pennsylvania, and Create Music Group, Inc. ("CMG"), a Delaware corporation with its principal place of business in California, is at the center of this case (the "DatPiff Agreement"). Under the terms of the DatPiff Agreement, Idle licensed specific visual-media rights to CMG for distribution on third-party digital platforms in exchange for agreed-upon royalty payments. According to Plaintiffs, the parties subsequently expanded the terms of the Agreement to incorporate certain audiovisual works, including sound recordings owned by Idle's wholly owned subsidiary, The Dispensary, LLC ("Dispensary"). Idle and Dispensary (together, "Plaintiffs") now bring this action for breach of contract and various related state law claims against CMG and Kyle Reilly, a former employee of Idle (together, "Defendants"), in connection with the licensing of those sound recordings and other audiovisual works (the "Dispensary Content").

Now before the Court are CMG's motion to transfer venue to the Central District of California, and Reilly's and CMG's motions to dismiss the First Amended Complaint (the "FAC"). For the following reasons, this Court GRANTS CMG's motion to transfer venue to the Central

District of California pursuant to 28 U.S.C. § 1404(a) and therefore DENIES as moot Reilly's

motions to dismiss for improper venue and lack of personal jurisdiction.

## BACKGROUND

### I.    Factual Allegations

The Court accepts the factual allegations in the FAC as true and draws all reasonable

inferences in Plaintiffs' favor.  *See Costin v. Glens Falls Hosp.*, 103 F.4th 946, 952 (2d Cir. 2024).

The Court also considers materials incorporated by reference in the FAC, integral to the FAC, or

subject to judicial notice.  *See United States ex rel. Foreman v. AECOM*, 19 F.4th 85, 106 (2d Cir.

2021); *Michael Greco Prods., Inc. v. RADesign, Inc.*, 112 F.4th 144, 148 n.1 (2d Cir. 2024).

Finally, because a motion to transfer is before the Court alongside Defendants' motions to dismiss,

the Court also considers materials in affidavits, pleadings, and other papers for purposes of the

motion to transfer.  *Mohsen v. Morgan Stanley & Co.*, No. 11-cv-06751 (PGG), 2013 WL 5312525,

at *3 (S.D.N.Y. Sept. 23, 2013) ("In deciding a motion to transfer, a court may consider material

outside of the pleadings.").

### A.  The Parties

Idle is a media company incorporated in Nevada and headquartered in Pennsylvania.  *See*

Dkt. 24 ("FAC") ¶ 12.  In or around 2018, Idle started a record company called Dispensary, which

was the "owner and/or exclusive licensee of various works that Idle controlled the exploitation of,"

including audiovisual works and sound recordings.  *Id.* ¶¶ 32, 34.  Dispensary is likewise

headquartered in Pennsylvania and is incorporated in Pennsylvania.  *Id.* ¶ 13.  During the relevant

time period, Kyle Reilly was the Executive Vice President of Music for Idle.  *Id.* ¶ 35.  In that role,

Reilly was responsible for operating the "Dispensary Project," including controlling the

Dispensary's sound recordings and other audiovisual works.  *Id.* ¶ 37.  Reilly resides in Los Angeles

County, California.  *Id.* ¶ 20.  Plaintiffs nonetheless maintain that Reilly is subject to personal

jurisdiction in this Court based on his "actions as Idle's Executive Vice President when he was employed by Idle" (a corporation not based in New York) and "his subsequent conduct related to, and in concert with, CMG" (a company that is likewise not based in New York). *Id.* ¶ 10. According to Plaintiffs, the Dispensary Content is "distributed to and consumed by consumers within this judicial district." *Id.* ¶ 7.

CMG is a music distribution company incorporated in Delaware, with its headquarters in Los Angeles County, California. *Id.* ¶ 15. It does not have offices, property, or bank accounts in New York. Dkt. 34-2 ("Strauss Decl.") ¶¶ 12-17. CMG provides "services to music artists and recording labels," including "digital music store distribution, royalty collections from digital streaming[,] and data and analytics for earnings from the same." FAC ¶ 16. This includes streaming the Dispensary Content at issue in this litigation through online streaming services such as YouTube, Spotify, Apple Music, and iTunes. *Id.* ¶ 8.

Plaintiffs further allege that "CMG enters into agreements with third parties . . . that contain New York jurisdiction clauses, including in its Disclaimer i.e. terms of service on its website." *Id.* ¶ 19. CMG's terms of service on its website govern the relationship between CMG and users of its services, "including but not limited to the use of the website www.createmusicgroup.com (Website); [CMG's] applications, including but not limited to, Splits, Client Portal, Create Licensing, Account Management, Client Management, & Create Expert; its network; and [CMG's] personalized support." Dkt. 58-1 ("Disclaimer") ¶ 1; FAC ¶ 6. The Disclaimer also incorporates a dispute-resolution clause which provides that "[t]his Agreement is governed by the laws of the United States, and specifically, the State of New York. Any disputes arising from or related to this

Agreement will be submitted to the competent court of New York, NY." Disclaimer ¶ 10; FAC ¶ 6.[1]

### B. Factual Background

In or about May 2017, Idle entered into a written agreement with CMG whereby CMG obtained a license to distribute a "selection of visual media" that Idle "own[ed] and/or controll[ed]" on third-party platforms, websites, and applications. FAC ¶ 21; Dkt. 57-1 ("DatPiff Agreement"). The defined licensor under the DatPiff Agreement was "DatPiff" — a service owned at the time by Idle. FAC ¶ 23; DatPiff Agreement at 2. The Datpiff Agreement governed "any visual media . . . solely owned or controlled by licensor [DatPiff]." DatPiff Agreement § 1(b). Under the DatPiff Agreement, DatPiff granted CMG the "exclusive right" to distribute DatPiff's visual-media content on third-party digital platforms, *id.* § 1(h)4, including but not limited to Facebook, MySpace, Snapchat, and any other website and/or social media platform which contains Youtube hosted and/or embedded videos, *id.*§§ 1(h). In exchange, CMG would return 80 percent of the net revenue actually received by CMG from the monetization of DatPiff's content on a monthly basis. FAC ¶¶ 22, 81; DatPiff Agreement § 6.

Relevant here, the DatPiff Agreement also incorporated a mandatory forum selection clause:

> This Agreement shall be governed by and construed in accordance with the laws of the State of New York, without giving effect to principles governing conflicts of laws. The parties consent and agree that all legal proceedings arising out of or relating to this Agreement shall be exclusively maintained in either the federal or state courts in New York, NY located in the State of New York, and, by execution and delivery of

---

[1] Although Plaintiffs did not attach either CMG's Disclaimer or Idle's 2017 DatPiff Agreement with CMG to the FAC, these documents are incorporated by reference in the Complaint and are integral to the allegations therein. *See, e.g.,* FAC ¶ 6 (including a hyperlink to the Disclaimer and quoting paragraphs 1 and 10 of the Disclaimer); FAC ¶¶ 21-24 (referring to the 2017 Agreement between Idle and CMG); *see Clark v. Hanley*, 89 F.4th 78, 93 (2d Cir. 2023) (noting that, on a motion to dismiss, courts "may review . . . documents appended to the complaint or incorporated in the complaint by reference . . . as well as documents not expressly incorporated by reference in the complaint that are nevertheless 'integral' to the complaint" (alterations adopted) (citations and quotation marks omitted)).

this Agreement, each of the parties to this Agreement accepts the exclusive jurisdiction of such courts and irrevocably agrees to be bound by any judgment rendered thereby in connection with this Agreement.  Each party hereto irrevocably waives any objection to the laying of venue of any such suit, action, or proceeding brought in such courts and irrevocably waives any claim that any such suit, action or proceeding brought in any such court has been brought in an inconvenient forum.

*Id.* § 17.  The DatPiff Agreement also contains a provision excluding third party beneficiaries, *see id*. § 23, and a provision providing that "[n]o modification, amendment, supplement to or waiver of this Agreement shall be binding upon the parties unless made in writing and duly signed by both parties," *id*. § 24.

The DatPiff Agreement was signed by Marcus Frasier, Idle's CEO.  FAC ¶ 24.  According to Plaintiffs, pursuant to the DatPiff Agreement, CMG sent Idle 1099s until 2019.  *Id.* ¶ 25.  Plaintiffs assert that, "[s]ince entering into the [DatPiff] Agreement, Idle has performed by providing Idle's Visual Content to CMG, for which, for a time, CMG had been remitting the Net Revenue derived from its exploiting of Idle's Visual Content back to Idle."  *Id.* ¶ 27.  CMG initially provided Idle with statements of its earnings by email, but subsequently switched to providing statements through its web-based client portal.  *Id*. ¶ 28.  On or about October 1, 2019, Idle sold certain of its assets related to the DatPiff platform to a third party, Medialab.AI Inc ("Medialab")*. Id.* ¶ 49.  At that time, CMG entered into a new agreement with MediaLab to distribute the DatPiff Content.  Strauss Decl. at 18-31.

Following the parties' initial agreement, Idle began to provide CMG with audio content as well.  FAC ¶ 29.  According to Plaintiffs, "Idle's performance of its obligation to provide Audio Content and CMG's performance under the [DatPiff] Agreement in the same manner as it performed with respect to Idle's Visual Content, constituted an amendment of the [DatPiff] Agreement."  *Id*. ¶ 30.  At a minimum, Plaintiffs argue, the parties "entered into an implied license regarding Idle's Audio Content under the [DatPiff] Agreement."  *Id*. ¶ 31.

In or around 2018, Idle formed a wholly owned subsidiary, the Dispensary, for purposes of starting its own record company. *Id.* ¶ 32. The Dispensary was established as a record label for purposes of distributing sound recordings and other audiovisual works. *Id*. ¶ 33. According to Plaintiffs, Dispensary was "the owner and/or exclusive licensee" of those works, but Idle "controlled the[ir] exploitation." *Id*. ¶ 34.

Plaintiffs claim that CMG and Idle subsequently entered into a licensing agreement with respect to the Dispensary Content on the same terms and conditions as set forth in the DatPiff Agreement. *See, e.g.*, *id.* ¶¶ 40-41, 98, 124-48. Plaintiffs plead four contractual theories in support of such an agreement.

First, Plaintiffs allege that, because Idle and CMG already had an agreement in place that governed CMG's rights and obligations with respect to Idle's audio and visual content, "the Dispensary Content was intended to be included under, and governed by, the [DatPiff] Agreement." *Id.* ¶ 40. In the alternative, Plaintiffs plead that Idle's and CMG's subsequent course of conduct constituted an amendment to the DatPiff Agreement's terms to incorporate the Dispensary Content. *Id.* ¶ 41. Third, and as another alternative, Plaintiffs allege that Dispensary licensed the Dispensary Content to CMG under a separate agreement (the "Dispensary Agreement") incorporating the same terms and conditions as in the DatPiff Agreement. *Id.* ¶ 98. Finally, in the event that all of the above theories are rejected by the Court, Plaintiffs plead an implied-in-fact contract between either Idle or Dispensary and CMG, pointing to the parties' "continued conduct pursuant to the [DatPiff] Agreement, Idle, Dispensary, and CMG's course of dealing, their course of performance[,] and the facts and circumstances surrounding their business relationship." *Id.* ¶ 127; *see id.* ¶¶ 124-48.

Throughout the relevant period, Reilly was the Executive Vice President of Music for Idle and responsible for controlling the Dispensary Project's sound recordings and other audiovisual works. *Id.* ¶¶ 35, 37. Reilly had access to Idle's accounts with CMG, including through Idle's web-

6

based portal with CMG.  *Id.* ¶ 36.  Plaintiffs allege that, "[u]pon information and belief," it was Reilly who "helped arrange to provide the Dispensary Content owned by Dispensary and controlled by Idle to CMG."  *Id.* ¶ 38.  According to Plaintiffs, Reilly subsequently instructed CMG to set up a separate login and account for the Dispensary Project payments and directed CMG to issue the royalty payments for the Dispensary Content to his personal bank account.  *Id.* ¶¶ 43-45.

Plaintiffs allege that, in or around September 2022, they "first discovered" that they had not been paid the royalty payments due for the Dispensary Content (the "Dispensary Revenues"), and that those payments had instead been made to Reilly.  *Id.* ¶¶ 51-52.  Plaintiffs subsequently followed up with CMG and Reilly regarding the outstanding royalty payments.  *Id.* ¶ 53.  On or about September 27, 2022, Frasier asked CMG why CMG's web-based portal showed that a royalty payment had been made on September 22, 2022, when no such payment had been received by Plaintiffs.  *Id.* ¶ 54.  Plaintiffs separately sought to contact CMG through CMG's website but received no response.  *Id.* ¶ 55.  On November 16, 2022, Dispensary sent a formal demand letter for full payment of the amounts CMG earned and owed, totaling approximately $501,439.77.  *Id.* ¶ 58; Dkt. 34-3 ("Gipson Decl.") ¶ 4.  That letter, incorporated by reference in the FAC, represented that "[Dispensary] and CMG entered into an agreement whereby the Dispensary granted CMG a license to distribute their recordings on various digital platforms such as Apple Music, YouTube, Spotify, and iTunes."  Gipson Decl. at 4.  According to Plaintiffs, that same day, Reilly admitted to Frasier that he had been retaining the royalty payments for the Dispensary Content each month, to which Frasier responded that Reilly had never been authorized to redirect funds to himself.  FAC ¶¶ 62-63.

Plaintiffs assert that, to date, CMG and Reilly have failed to make the outstanding royalty payments to Plaintiffs.  *Id.* ¶ 66.  Specifically, Plaintiffs allege that "[u]pon information and belief, either Reilly continues to receive the Dispensary Revenues from CMG, and/or CMG continues to hold Plaintiffs' Dispensary Revenues without remitting to Plaintiffs."  *Id.* ¶ 67.

## II.    Procedural History

Plaintiffs brought this action on February 2, 2024.  Dkt. 1.  On March 15, 2024, CMG filed a motion to dismiss.  Dkt. 11.  In response, on April 5, 2024, Plaintiffs filed their FAC, adding Dispensary as a plaintiff and asserting ten separate counts, several of which were pleaded in the alternative.  *See* FAC.  Specifically, Dispensary and/or Idle allege breach of contract, unjust enrichment, implied contract, conversion, conspiracy, and breach of fiduciary duty claims against CMG and/or Reilly.  *See generally id.*

On April 26, 2024, CMG filed a motion to transfer venue under 28 U.S.C. § 1404(a), and, in the alternative, a motion to dismiss all claims against it.  Dkt. 34.  On May 24, 2024, Plaintiffs filed an opposition to CMG's motion to dismiss, Dkt. 48, and on June 6, 2024, CMG filed a reply, Dkt. 54.  On May 20, 2024, Reilly filed his own motion to dismiss each of the claims alleged against him in the FAC.  Dkt. 45.  On June 14, 2024, Plaintiffs filed their opposition to Reilly's motion to dismiss, Dkt. 56, and on June 28, 2024, Reilly filed a reply, Dkt. 63.

## LEGAL STANDARD

To survive a motion to dismiss under Federal Rule of Civil Procedure ("Rule") 12(b)(6), a complaint must contain "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Francis v. Kings Park Manor, Inc*., 992 F.3d 67, 72 (2d Cir. 2021) (quoting *Aschroft v. Iqbal*, 556 U.S. 662, 678, 680 (2009)).  The Court draws all reasonable inferences in Plaintiffs' favor and accepts as true all nonconclusory allegations of fact.  *Id.*  However, the "tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions."  *Iqbal*, 556 U.S. at 678.  A complaint must allege "more than a sheer possibility that a defendant has acted unlawfully" and more than "facts that are 'merely consistent with' a defendant's liability."  *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007)).

Determining whether a complaint states a claim is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679.

Under 28 U.S.C. § 1404(a), a district court may transfer a civil action to any other district "[f]or the convenience of parties and witnesses" and "in the interest of justice." 28 U.S.C. § 1404(a); *accord Lowinger v. Rocket One Cap.*, *LLC*, No. 23-cv-09243 (JPC), 2024 WL 2882622, at *3 (S.D.N.Y. June 5, 2024). "District courts have broad discretion in making determinations of convenience under Section 1404(a) and notions of convenience and fairness are decided on a case-by-case basis." *D.H. Blair & Co. v. Gottdiener*, 462 F.3d 95, 106 (2d Cir. 2006). In deciding a motion to transfer venue under Section 1404(a), courts inquire first "whether the action could have been brought in the transferee district, and if yes, whether transfer would be an appropriate exercise of the Court's discretion." *Robertson v. Cartinhour*, No. 10-cv-8442 (TLS), 2011 WL 5175597, at *3 (S.D.N.Y. Oct. 28, 2011). Assessing whether transfer is appropriate requires the Court to balance various factors, including but not limited to:

> (1) the locus of the operative facts; (2) convenience of the parties; (3) the convenience of the witnesses; (4) the location of relevant documents and relative ease of proof; (5) the relative means of the parties; (6) the availability of process to compel attendance of unwilling witnesses; (7) a forum's familiarity with the governing law; (8) the weight accorded to plaintiff's choice of forum; and (9) trial efficiency and the interests of justice based on the totality of the circumstances.

*Burgos v. United States*, No. 16-cv-07091 (RA), 2017 WL 2799172, at *2 (S.D.N.Y. June 27, 2017) (citation omitted). "The movant bears the burden of demonstrating — by clear and convincing evidence — that the balance of convenience and the interests of justice warrant transfer." *Prokos v. Haute Living, Inc.*, No. 19-cv-00138 (PGG), 2020 WL 4677375, at *3 (S.D.N.Y. Aug. 11, 2020). "In resolving a motion for transfer, the Court assumes the allegations in the Complaint to be true but may also look to evidence outside of the Complaint, even to the degree that such evidence contradicts allegations in the Complaint." *Tianhai Lace USA Inc. v. Forever 21, Inc.*, No. 16-cv-

05950 (AJN), 2017 WL 4712632, at *2 (S.D.N.Y. Sept. 27, 2017); *Mohsen*, 2013 WL 5312525, at

*3 ("In deciding a motion to transfer, a court may consider material outside of the pleadings.").

"Where district courts are presented with both a motion to dismiss . . . and a motion to

transfer venue . . . , they commonly address the venue motion first, and, where transfer is

appropriate, leave the motion to dismiss to be decided by the transferee court." *N. Brevard Cnty.*

*Hosp. Dist. v. C.R. Bard, Inc.*, 648 F. Supp. 3d 401, 428 (N.D.N.Y. 2022) (citation omitted); *see,*

*e.g.*, *Lowinger*, 2024 WL 2882622, at *3 (deciding venue motion and "leav[ing] the Rule 12(b)(6)

motions for the transferee court to decide").  Addressing transfer applications first is appropriate

even when, as here, defendants move to dismiss for a lack of personal jurisdiction or improper

venue.  *See, e.g.*, *Volk Corp. v. Art-Pak Clip Art Serv.*, 432 F. Supp. 1179, 1181 (S.D.N.Y. 1977)

("[The Court] has power to transfer the case even if there is no personal jurisdiction over the

defendants, and whether or not venue is proper in [the] district, if a transfer would be in the interest

of justice." (footnotes omitted)).  "[W]here personal jurisdiction would likely exist in the transferee

district over a defendant who contests personal jurisdiction in the Southern District of New York, it

is prudentially appropriate to address venue first since a decision to transfer would render personal

jurisdiction analysis with respect to [the Southern District] irrelevant." *Everlast World's Boxing*

*Headquarters Corp. v. Ringside, Inc.*, 928 F. Supp. 2d 735, 741 (S.D.N.Y. 2013) (second alteration

in original) (citation and quotation marks omitted).

## DISCUSSION

### I.    CMG's Motion to Transfer

The Court therefore turns first to CMG's motion to transfer this action to the Central District

of California under 28 U.S.C § 1404(a).[2]  CMG argues that transfer is appropriate because this case

---

[2] Defendant Reilly, in moving to dismiss for improper venue pursuant to Rule 12(b)(3), also
requests in the alternative that the Court exercise its discretion under 28 U.S.C. § 1404(a) to transfer
this case to the Central District of California.  Dkt. 45 at 9 n.1.

has "no connection to New York." Dkt. 34-1 at 5. For the reasons set forth below, this Court agrees.

### A. Mandatory Forum Selection Clauses

Plaintiffs' central argument in opposition to the motion to transfer is that Defendants have waived objections to venue and personal jurisdiction because they are bound by the mandatory forum provisions in the DatPiff Agreement and in CMG's Disclaimer. Dkt. 48 at 4, 6, 9; Dkt. 56 at 3, 17.[3] The DatPiff Agreement's forum provision provides that all legal proceedings "arising out of or relating to this Agreement shall be exclusively maintained in either the federal or state courts" of New York, and that the parties accept the "exclusive jurisdiction" of those courts. FAC ¶ 82 (quoting DatPiff Agreement § 17). CMG's Disclaimer, in turn, states that it applies to "[a]ny

---

[3] Plaintiffs separately argue that CMG and Reilly did not address the validity and/or enforceability of the mandatory forum provisions in their opening briefs and thereby waived any related argument. Dkt. 48 at 5 n.3; Dkt. 56 at 6 n.4, 12. This misconstrues Defendants' opening briefs, which contest that there is *any* agreement governing the Dispensary Content and therefore necessarily object to the applicability of any forum selection clause. Dkt. 34-1 at 5; Dkt. 45 at 3, 9. Reilly's opening brief expressly disputes that he is a signatory to any agreement containing a New York forum selection clause. Dkt. 45 at 4-5. Moreover, Plaintiffs misapply cases holding that a party's silence on matters raised by an opposing party constitutes a waiver. *See, e.g.*, *Meridian Autonomous Inc. v. Coast Autonomous LLC*, No. 17-cv-05846 (VSB), 2018 WL 4759754, at *5 (S.D.N.Y. Sept. 30, 2018) (finding that, because Plaintiffs did not oppose moving defendants' arguments raised in defendants' opening brief, they conceded those points); *AT & T Corp. v. Syniverse Techs., Inc.*, No. 12-cv-01812 (NRB), 2014 WL 4412392, at *7 (S.D.N.Y. Sept. 8, 2014) (concluding that plaintiff's "silence [in its opposition] concedes the point"). CMG and Reilly did not fail to address the issue of the mandatory forum provisions; rather, they raise the issue in their opening briefs and provide further arguments in their replies — as they are entitled to do. *See Crystal IS, Inc. v. Nitride Semiconductors Co.*, No. 21-cv-00606, 2023 WL 2726702, at *3 n.5 (N.D.N.Y. Mar. 31, 2023) ("A reply memorandum of law may properly contain arguments responding to arguments asserted in an opposition memorandum of law[.]"). *Michael Bandler, MB & Co. v. BPCM NYC, Ltd.* does not dictate otherwise. 631 F. App'x 71 (2d Cir. 2016) (summary order). There, the Second Circuit rejected a request to "consider arguments raised for the first time in [plaintiff's reply brief," finding that doing so "would prejudice [defendant]." *Id.* at 71-72. Here, CMG's and Reilly's objections as to the enforceability of a mandatory forum selection clause are made *in response to* Plaintiffs' arguments regarding the same. The Court's consideration of Defendants' objections to Plaintiffs' reliance on the mandatory forum selection clauses therefore does not "prejudice" Plaintiffs. *See In re Harris*, 464 F.3d 263, 268 n.3 (2d Cir. 2006) (finding no unfairness in addressing issue raised by appellant for the first time on reply where appellee had raised the issue in its own brief and both parties had therefore fully briefed the matter).

disputes arising from or related to" CMG's agreement with users of its website and/or digital

services, and that any such disputes "will be submitted to the competent court of New York, NY."

*Id.* ¶ 6 (quoting Disclaimer ¶ 10).

Therefore, as a threshold matter, the Court must first determine whether the forum selection

clauses in the DatPiff Agreement and CMG's Disclaimer bind the parties to this action. If so, the

calculus changes for determining whether transfer is appropriate. *See Atl. Mar. Constr. Co. v. U.S.*

*Dist. Ct. for W. Dist. of Texas*, 571 U.S. 49, 63 (2013) ("The calculus changes . . . when the parties'

contract contains a valid forum-selection clause[.]"). "When parties agree to a forum-selection

clause, they waive the right to challenge the preselected forum as inconvenient or less convenient

for themselves or their witnesses, or for their pursuit of the litigation." *Id.* at 64; *accord Allianz*

*Glob. Corp. & Specialty v. Chiswick Bridge*, Nos. 13-cv-07559 (RA), 13-cv-07565 (RA), 2014 WL

6469027, at *3 (S.D.N.Y. Nov. 17, 2014). "As a consequence, a district court may consider

arguments about public-interest factors only. Because those factors will rarely defeat a transfer

motion, the practical result is that forum-selection clauses should control except in unusual cases."

*Atl. Mar.*, 571 U.S. at 64 (citation omitted).

To determine whether there is an enforceable forum selection clause, courts in this Circuit

consider the following factors: (1) whether the clause was reasonably communicated to the party

resisting enforcement; (2) whether the clause is mandatory or permissive, for example, whether the

parties are required to bring any dispute to the designated forum or simply permitted to do so; and

(3) whether the claims and parties involved in the suit are subject to the forum selection clause.

*Martinez v. Bloomberg LP,* 740 F.3d 211, 217 (2d Cir. 2014). If these factors are satisfied, the

forum selection clause is deemed "presumptively enforceable" and can be overcome only by a

"sufficiently strong showing that enforcement would be unreasonable or unjust, or that the clause

was invalid for such reasons as fraud or overreaching." *Id.* (quoting *Phillips v. Audio Active Ltd.*,

494 F.3d 378, 383-84 (2d Cir. 2007)); *see also Rabinowitz v. Kelman*, 75 F.4th 73, 81 (2d Cir. 2023) (detailing four-part framework).  In determining the enforceability of a mandatory forum selection clause, a court may rely on the pleadings and affidavits, but "[a] disputed fact may be resolved in a manner adverse to the plaintiff only after an evidentiary hearing."  *In re Optimal U.S. Lit.*, 813 F. Supp. 2d 351, 363 (S.D.N.Y. 2011) (alteration in original) (citation omitted).

These clauses were "reasonably communicated" to CMG and Reilly.  CMG was a signatory and counterparty to the DatPiff Agreement, and was therefore necessarily made aware of its terms, including the mandatory forum provision.  *See generally* DatPiff Agreement.  As for Reilly, Plaintiffs allege in their Complaint that Reilly was "aware of the terms of the [DatPiff] Agreement and the exclusive forum selection provision therein."  FAC ¶ 10.  This allegation is substantiated by the May 24, 2017 email appended to Idle CEO Frasier's declaration, which shows Reilly receiving the DatPiff Agreement via email.  Dkt 57-2 at 2-3.  Drawing all inferences in favor of Plaintiffs at this stage, the Court finds that it is reasonable to infer that Reilly reviewed the DatPiff Agreement and understood it contained a mandatory forum selection clause.  Plaintiffs have also pleaded sufficient facts to show that CMG and Idle used CMG's website and/or portal that is referenced by the Disclaimer.  FAC ¶¶ 28; 36.  They therefore also should have been aware of the Disclaimer's terms of service.

Moreover, the language of both clauses is mandatory and therefore does not allow for exceptions: any disputes arising from the agreements "shall be exclusively maintained in" or "will be submitted to" courts in New York.  A forum selection clause is deemed permissive if it confers jurisdiction in one forum without excluding jurisdiction elsewhere.  *Leasing Serv. Corp. v. Patterson Ents., Ltd.*, 633 F. Supp. 282, 284 (S.D.N.Y. Mar. 25, 1986).  In contrast, "[f]or a forum selection clause to be deemed mandatory, jurisdiction and venue must be specified with mandatory or exclusive language."  *Macsteel Int'l USA Corp. v. M/V Larch Arrow*, 354 F. App'x 537, 539 (2d

Cir. 2009) (summary order) (citation omitted).  Here, the provisions use obligatory and exclusionary language and thereby "requir[e]" rather than "simply permi[t]" the parties to bring suit in New York.  *Martinez*, 740 F.3d at 217 (citation and emphasis omitted); *see Phillips*, 494 F.3d at 386 (2d Cir. 2007) (forum selection clause was mandatory where it provided that "any legal proceedings that may arise out of [the agreement] *are to be* brought in England" (alteration in original) (emphasis added)); *Indem. Ins. Co. of N. Am. v. K-Line Am., Inc.*, No. 06-cv-00615 (BSJ), 2008 WL 4922327, at *7-8 (S.D.N.Y. Feb. 27, 2008) (forum selection clause providing that any dispute "shall be brought before the Tokyo District Court" was mandatory, not permissive).

Whether the mandatory forum selection clauses apply to the parties and claims involved here presents, however, a more complicated question.  "When determining the scope of a forum selection clause, the Court examines the substance of the claims, shorn of their labels, and relates the substance of the claims to the precise language of the clause . . . ."  *Speedfit LLC v. Woodway USA, Inc.*, 642 F. Supp. 3d 429, 444 (S.D.N.Y. 2022) (citation omitted).  Where broadly worded, a forum selection clause "is not limited solely to claims for breach of the contract that contains it." *Cfirstclass Corp. v. Silverjet PLC*, 560 F. Supp. 2d 324, 329 (S.D.N.Y. 2008) (citing *Roby v. Corp. of Lloyd's*, 996 F.2d 1353, 1361 (2d Cir. 1993)).  Therefore, a "forum selection clause should not be defeated . . . if [the claims asserted] grow out of the contractual relationship, or if 'the gist' of those claims is a breach of that relationship."  *Anselmo v. Univision Station Grp., Inc.*, No. 92-cv-01471 (RLC), 1993 WL 17173, at *2 (S.D.N.Y. Jan. 15, 1993) (quoting *Bense v. Interstate Battery Sys., Inc.*, 683 F.2d 718, 720 (2d. Cir. 1982)).  When interpreting forum selection clauses, courts differentiate between provisions using narrower terms, such as "arising under," versus broader language such as "in connection with," "relating to," or "associated with."  *See, e.g.*, *Prod. Res. Grp., L.L.C. v. Martin Pro., A/S*, 907 F. Supp. 2d 401, 412 (S.D.N.Y. 2012).  "In contrasting these phrases with the phrase 'arising out of,' courts have noted that 'in connection with,' 'relating to,'

and 'associated with' are all typically defined more broadly than 'arising out of,' and are not necessarily tied to the concept of a causal connection." *MAK Mktg., Inc. v. Kalapos*, 620 F. Supp. 2d 295, 305-06 (D. Conn. 2009) (citing *Coregis Ins. Co. v. Am. Health Found., Inc*., 241 F.3d 123, 127-28 (2d Cir. 2001)); *see also Kortright Cap. Partners LP v. Investcorp Inv. Advisers Ltd*., 327 F. Supp. 3d 673, 687 (S.D.N.Y. 2018) ("Judges in this District have construed 'relating to' as tantamount to having a connection, relation, or association with something.").

The Court will first examine the forum selection clause in the CMG Disclaimer. Notwithstanding the broad "related to" language in the clause, the claims asserted here neither "arise from" nor are "related to" CMG's Disclaimer for users of its services and applications. Disclaimer ¶ 10. Plaintiffs argue that the Disclaimer applies here because Plaintiffs used CMG's services and the "services that CMG provided under the [DatPiff] Agreement are the same services that are subject to the Disclaimer." Dkt. 48 at 8. Plaintiffs' argument as to the applicability of the Disclaimer's forum selection clause misses the mark. The Disclaimer's forum selection clause applies only to those disputes "arising from or related to *this Agreement*." Disclaimer § 10 (emphasis added). "Although the terms 'related to' and 'in connection to' may be broader than the term 'arising out of,' they do not extend to any dispute between the parties." *Allianz Global*, 463 F. Supp. 3d at 437 (citation and quotation marks omitted). Here, Plaintiffs' claims are unrelated to the Disclaimer Agreement, which is directed primarily toward setting forth terms of service for CMG's users and constraining CMG's liability with respect to the use of its services. *See generally* Disclaimer. Even though Reilly (and Idle) received some payments through CMG's portal, the claims in this action do not relate to the use of the portal or CMG's services. (They might have been related if, for example, the claims related to a data breach during the transmission of payments.) Rather, the claims here relate to whether there is an obligation by Defendants to pay Plaintiffs royalties pursuant to a separate written or implied licensing agreement. CMG's rights and

obligations under the DatPiff Agreement (or some other agreement governing the Dispensary Content), including its exclusive right to distribute the content and its obligation to make monthly royalty payments, have nothing to do with the terms of use in CMG's Disclaimer. *Compare* DatPiff Agreement § 4 (granting CMG an "exclusive right" to DatPiff's visual-media content), *and id.* § 6 (imposing royalty payments on CMG), *with* Disclaimer ¶ 4 ("User grants Provider a license that is *royalty-free and non-exclusive* . . . as regards all the information shared by the User through the Services[.]" (emphasis added)). This is also not an instance where Defendants have indicated that they intend to invoke the Disclaimer as a defense to Plaintiffs' claims. *Cf. Prod. Res. Grp., L.L.C.*, 907 F. Supp. 2d at 413 (patent infringement claims were "relate[d] to" license and consultancy agreements where defendants were likely to invoke the agreements as a defense to plaintiff's claims). The Court therefore does not find an "established or discoverable relation" between CMG's Disclaimer and Plaintiffs' breach of contract and related claims. *Coregis*, 24 F.3d at 128 (observing that the term "relating to" means "connected by reason of an established or discoverable relation").

The applicability of the mandatory forum selection clause in the DatPiff Agreement, however, is not as straightforward an inquiry. Plaintiffs argue that either the DatPiff Agreement — or a separate agreement incorporating the same terms and conditions as the DatPiff Agreement — governs the parties' claims and therefore requires that this lawsuit be brought in New York. FAC ¶¶ 40-41, 98, 127-28, 139-40. Defendants dispute that the DatPiff Agreement, or any agreement incorporating the DatPiff Agreement's mandatory venue provision, applies. Dkt. 34-1 at 5-6. The Court is therefore in the unusual posture of having to address the merits of Plaintiffs' breach of contract claims, or at least the portion of those claims that concerns whether there is a contract between the parties, to determine the enforceability of a forum selection clause for purposes of resolving the motion to transfer. In other words, to determine whether a forum selection clause

16

applies to the parties and claims in this action, the Court must first determine (1) whether Plaintiffs have sufficiently pleaded the formation of a contract governing the distribution of the Dispensary Content; and (2) if so, whether that contract incorporates the DatPiff Agreement's forum selection clause.  The Court will therefore address each of Plaintiffs' contractual theories in turn to determine whether Plaintiffs have sufficiently pleaded the formation of a contract containing a mandatory forum selection clause.  For the reasons set forth below, the Court concludes that Plaintiffs have not done so.

### 1.   The DatPiff Agreement Between CMG and Idle Media

Plaintiffs assert that the initial DatPiff Agreement between CMG and Idle applies to the Dispensary Content and that the DatPiff Agreement's mandatory forum selection clause therefore governs the claims here.  FAC ¶ 40; Dkt. 48 at 19.  The Court disagrees.

The plain and unambiguous language of the DatPiff Agreement makes clear that it applies only to DatPiff's Content, not, as Plaintiffs contend, to Idle's content generally.  *See generally* DatPiff Agreement.  The Agreement explicitly states that it applies only to "visual media . . . solely owned or controlled by Licensor," with "Licensor" defined as "DatPiff."  DatPiff Agreement at 1-2. Under the terms of the Agreement, DatPiff granted CMG an "exclusive right" to monitor and distribute DatPiff's visual media on digital websites, URLs, domains, and applications.  *Id.* § 4. Nothing in the DatPiff Agreement indicates, as Plaintiffs suggest, that the entirety of Idle Media's content was governed thereunder.  A court need not credit a complainant's interpretation of a contract at the motion to dismiss stage if, as here, "the terms of the contract are unambiguous," that is, if they have a "definite and precise meaning."  *Orchard Hill Master Fund Ltd. v. SBA Commc'ns Corp.*, 830 F.3d 152, 156-57 (2d Cir. 2016) (citation omitted); *see also Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.*, 62 F.3d 69, 71 (2d Cir. 1995) (considering agreement that complaint "relie[d] heavily upon" and holding that the court is "not constrained to accept the allegations of the

complaint in respect of the construction of the Agreement"). Moreover, the DatPiff Agreement was executed in or around May 24, 2017 — before the Dispensary and the Dispensary Content were even in existence. FAC ¶¶ 21, 32. The parties therefore could not have contemplated the inclusion of the Dispensary Content under the DatPiff Agreement at the time of contracting. Plaintiffs make much of the fact that CMG treated Idle as a party to the contract, including by issuing 1099 tax forms to Idle. *Id.* ¶¶ 23-26. The fact that Idle may have been the counterparty to the DatPiff Agreement does not, however, alter the intended subject of the DatPiff Agreement, which was unambiguously limited to *DatPiff's* content.

Plaintiffs argue in the alternative that the parties' subsequent course of conduct constitutes an amendment to the DatPiff Agreement's terms to cover the Dispensary Content. FAC ¶¶ 41, 85-86. This claim, too, fails to pass the threshold from possibility to plausibility. Under New York law, "parties may modify a contract by another agreement, by course of performance, or by conduct amounting to waiver or estoppel." *Kaplan v. Old Mut. PLC*, 526 F. App'x 70, 72 (2d Cir. 2013) (summary order) (citation and quotation marks omitted). "Modifications of written contracts may be proved circumstantially by the conduct of the parties subsequent to the agreement." *Kamhi v. E. Coast Pain Mgmt., P.C.*, 112 N.Y.S.3d 189, 191 (App. Div 2019). "[F]undamental to the establishment of a contract modification is proof of each element requisite to the formulation of a contract, including mutual assent to its terms." *Dallas Aerospace, Inc. v. CIS Air Corp.*, 352 F.3d 775, 783 (2d Cir. 2003) (citation omitted).

Plaintiffs assert that the parties' "subsequent unequivocal conduct whereby Idle provided the Dispensary Content to CMG and CMG performed its services with respect to the Dispensary Content just as CMG previously did with the Idle Visual Content and Idle's Audio Content, constituted an amendment/modification of the Agreement to include Dispensary Content therein." FAC ¶ 41; *see* Dkt. 48 at 20. This argument fails for several reasons. As an initial matter, the

18

DatPiff Agreement provides that "[n]o modification, amendment, supplement to or waiver of this Agreement shall be binding upon the parties unless made in writing and duly signed by both parties." DatPiff Agreement § 24. While this provision does not wholly preclude Plaintiffs' modification theory, it sets a demanding standard for establishing that an amendment of the DatPiff Agreement's terms in fact took place.

Provisions prohibiting modifications absent a writing are enforceable under New York law. N.Y. Gen. Oblig. Law § 15-301(1); *see, e.g.*, *Southern Fed. Sav. and Loan Ass'n of Georgia v. 21-26 East 105th St. Assocs.*, 145 B.R. 375, 380 (S.D.N.Y. 1991). Despite this, "New York recognizes oral modification or waiver of a contractual provision . . . under limited circumstances," specifically:

> (1) 'when there has been partial performance of an agreement to modify, so long as the partial performance is unequivocally referable to the oral modification,' or (2) 'when one party has induced the other party to rely on an oral modification' such that 'the first party may be equitably estopped from invoking the requirement that any modification be in writing.'

*DiStefano v. Maclay*, 102 F. App'x 188, 189 (2d Cir. 2004) (summary order) (quoting *Towers Charter & Mar. Corp. v. Cadillac Ins. Co.*, 894 F.2d 516, 522 (2d Cir. 1990)). For a partial performance to be "unequivocally referable" to the oral modification, "the action taken must be unintelligible or at least extraordinary, explainable only with reference to the oral agreement." *Merrill Lynch Interfunding, Inc. v. Argenti*, 155 F.3d 113, 122 (2d Cir. 1998) (citation and quotation marks omitted). "[W]here the performance is 'reasonably explained' by the possibility of other reasons for the conduct, the performance is equivocal." *Id.* (citation omitted).

Plaintiffs cannot satisfy this demanding standard. For one, Plaintiffs do not even allege an oral agreement to modify the terms of the DatPiff Agreement. Instead, they plead that the parties' "*conduct* . . . constituted an amendment/modification of the Agreement" to incorporate the Dispensary Content. FAC ¶ 41 (emphasis added). However, absent an agreement, "conduct itself

cannot produce a modification of [a] contract." *Southern Fed. Sav. and Loan Ass'n of Georgia v.
21-26 East 105th St. Assocs.*, 145 B.R. 375, 381 (Bankr. S.D.N.Y. 1991), *aff'd*, 978 F.2d 706 (2d
Cir. 1992); *Grandonico v. Consortium Comms. Int'l, Inc.*, 566 F. Supp. 1288, 1291 (S.D.N.Y. 1983)
("[W]hile partial performance may be used to prove an oral agreement where it is alleged that an
oral agreement was made, there must be an oral *agreement* to alter the written contract").  Conduct
is at best "evidence of an agreement based upon consideration between both parties to modify the
existing contract." *Southern Fed. Sav. and Loan Assn' of Georgia*, 145 B.R.at 381; *see also Onex
Food Servs., Inc. v. Grieser*, No. 93-cv-0278 (DC), 1996 WL 103975, at *4 (S.D.N.Y. Mar. 11,
1996).

     Moreover, performance here is "reasonably explained" by the existence of a separate license
agreement between Dispensary and CMG.  A letter sent by Plaintiffs' counsel and incorporated by
reference in the FAC, *see* FAC ¶ 58, represents that Dispensary — not Idle — was the counterparty
to the alleged agreement with CMG to distribute the Dispensary Content and therefore the proper
recipient of the Dispensary Revenues.  *See* Gipson Decl. at 4.  The letter, dated November 16, 2022,
represents that "our Client [defined as The Dispensary LLC] and CMG entered into an agreement
wherein the *Dispensary* granted CMG a license to distribute their recordings on various digital
platform such as Apple Music, YouTube, Spotify, and iTunes, and in exchange is required to pay
[Dispensary] with respect to same." *Id.* (emphasis added).  Counsel's letter shows outstanding
royalty payments through October 31, 2022.  *Id.*  Plaintiffs push back and contend that "[e]ven
though the letter referred to Dispensary's rights in the Dispensary Content and Dispensary Revenue,
CMG was aware that the letter was also sent on Idle's behalf" because "Dispensary is a subsidiary
of Idle and CMG's rights and obligations in the Dispensary Content is governed by the [DatPiff]
Agreement."  FAC ¶ 59.  The letter, however, makes no reference whatsoever to Idle and explicitly
states that Dispensary is the counterparty to an agreement governing the Dispensary Content.  If, as

here, a "document relied on in the complaint contradicts allegations in the complaint, the document, not the allegations, control, and the court need not accept the allegations in the complaint as true." *Poindexter v. EMI Rec. Grp. Inc.*, No. 11-cv-00559 (LTS), 2012 WL 1027639, at *2 (S.D.N.Y. Mar. 27, 2012); *see also MBIA Inc. v. Certain Underwriters at Lloyd's*, 33 F. Supp. 3d 344, 353 (S.D.N.Y. 2014) ("Allegations in the complaint that are 'contradicted by more specific allegations or documentary evidence' are not entitled to a presumption of truthfulness." (quoting *Kirkendall v. Halliburton, Inc.*, 707 F.3d 173, 175 n.1 (2d Cir. 2013))).  The prelitigation demand letter describing the contract between the parties therefore renders Plaintiffs' modification theory deficient.  *See Weiss v. Sherloq Revenue Sols., Inc.*, No. 19-cv-07103 (NSR), 2021 WL 965810, at *4 (S.D.N.Y. Mar. 12, 2021) (dismissing plaintiff's complaint as deficient because "the actual letters cited to in the Complaint and attached therein state that the letter [at issue in the litigation] is from 'Sherloq Financial' and do not reference [the defendant] 'Sherloq Revenue' at all").[4]

The Court is not persuaded by Plaintiffs' further efforts to exclude and/or dispute the relevance of the November 16, 2022 letter.  Plaintiffs contend that the letter is impermissible hearsay.  *See* Dkt. 48 at 16.  The Court is, however, entitled to consider "any written instrument attached to [a complaint] as an exhibit, materials incorporated in it by reference, and documents that, although not incorporated by reference, are 'integral' to the complaint."  *Sira v. Morton*, 380 F.3d 57, 67 (2d Cir. 2004) (citations omitted); *see also Flatscher v. Manhattan Sch. of Music*, 551

---

[4] Notably, in 2019, Idle sold DatPiff and its related rights therein to MediaLab, and by December 2020, CMG entered into a separate agreement with MediaLab to distribute the DatPiff Content.  *See* FAC ¶ 88; Strauss Decl. at 2-3, 18-31.  The transfer in ownership of the underlying assets that were the subject of the DatPiff Agreement further suggests that, if the parties intended to license new Dispensary Content through 2022, they would have needed to execute a separate contract to do so.  *See, e.g., Strategic Cap. Dev. Grp. Ltd. v. Sigma-Tau Pharm., Inc.*, No. 97-cv-02339 (RPP), 1998 WL 26191, at *3 (S.D.N.Y. Jan. 26, 1998) ("Although a contract may be  modified orally, or circumstantially by the actions of the parties…because a modification is an agreement to abridge or amend an enforceable contractual duty under an existing agreement, generally such a modification must occur during the contract period").

F. Supp. 3d 273, 280 n.7 (S.D.N.Y. 2021) (rejecting hearsay objection where the documents at issue were "incorporated by reference in the complaint"). The Court may therefore consider the letter, which Plaintiffs relied on to establish the amount in controversy and to establish prior demand for payment. FAC ¶¶ 58, 60.

Plaintiffs also maintain that there is no basis for the Court to find that the letter "contradicts" the FAC. Dkt. 48 at 17. According to Plaintiffs, "the Letter supports one version of the facts pled here regarding Dispensary's claims but does not contradict the other set of facts regarding Idle's." *Id.* However, by Plaintiffs' own admission, Dispensary's and Idle's breach of contract claims are pled in the alternative. *See id.* at 18. Therefore, because the letter supports Dispensary's claim that it was the counterparty to a separate contract governing the Dispensary Content and licensed the Dispensary content thereunder, the letter necessarily conflicts with — and forecloses — Idle's claims that Idle licensed the Dispensary Content under either the DatPiff Agreement or an implied contract. The Court also rejects Plaintiffs' attempts to dispute the authenticity of the letter, *see* Dkt. 56 at 8-9, which was sent by its own counsel prior to the commencement of this litigation. Dkt. 34-3 at 4-5; *see, e.g.*, *York Rsch. Corp. v. Landgarten*, 927 F.2d 119, 122 (2d Cir. 1991) ("As the Supreme Court has observed, a litigant 'is deemed bound by the acts of his lawyer-agent . . . .'" (quoting *Link v. Wabash R.R.*, 370 U.S. 626, 634 (2d Cir. 1978))).

Finally, even if the DatPiff Agreement covered the Dispensary Content — and the Court finds that it does not — CMG rightly observes that there are two parties in this case that were not parties to the DatPiff Agreement: Kyle Reilly and the Dispensary LLC. Because Dispensary LLC is not a signatory to the Agreement, and because the Agreement "expressly disclaim[s] third-party beneficiaries," Dispensary LLC "cannot enforce the[] forum selection clause[]" contained in the DatPiff Agreement. *In re Teekay Offshore Partners L.P. Common Unitholders Litig.*, No 19-cv-06483 (RA), 2021 WL 1227415, at *7 n.6 (S.D.N.Y Mar. 31, 2012). The Agreement explicitly

states that it is "not intended to confer any rights or benefits on any third party, and that there are no third party beneficiaries as to this Agreement or any part or specific provision of this Agreement." DatPiff Agreement § 23. "[C]ourts have held that nonparties cannot rely on a forum selection clause where," as here, "the relevant agreement states that it does not confer rights to nonparties." *Lu v. Cheer Holding Inc*., No. 24-cv-00459 (RA), 2024 WL 4149869, at *6 (S.D.N.Y. Sept. 10, 2024) (collecting cases); *see also APA Excelsior III L.P. v. Premiere Techs., Inc*., 49 F. Supp. 2d 664, 670-71 (S.D.N.Y. 1999) (holding that forum selection clause was not dispositive to motion to transfer where it was "unclear whether Plaintiffs are able to invoke the forum selection clause against defendants" because plaintiffs were not parties to the agreement and "only one defendant was"). In arguing otherwise, Plaintiffs cite *Magi XXI, Inc. v. Stato della Città del Vaticano*, which held that a "non-party to a contract may enforce a forum selection clause if the relationship between the non-party and the signatory is sufficiently close so that the non-party's enforcement of the forum selection clause is foreseeable by virtue of the relationship between the signatory and the party sought to be bound." Dkt. 48 at 8 (quoting *Magi XXI, Inc*., 818 F. Supp. 2d 597, 605 (E.D.N.Y. Aug. 24, 2011), *aff'd*, 714 F.3d 714 (2d Cir. 2013) (alterations in original)). *Magi* did not, however, address the effect of a contractual provision expressly excluding third-party beneficiaries.

Nor can the Agreement's mandatory forum selection clause be enforced against Defendant Reilly. As noted above, forum selection clauses are only enforced against non-parties when they are so closely related to a dispute that it is "'foreseeable' that [they] will be bound" — a "non-party is 'closely related' to a dispute if its interests are 'completely derivative' of and 'directly related to, if not predicated upon' the signatory party's interests or conduct." *Miller v. Mercuria Energy Trading, Inc*., 291 F. Supp. 3d 509, 523 (S.D.N.Y. 2018) (first quoting *Nanopierce Techs., Inc. v. Southridge Cap. Mgmt. LLC*, No. 02-cv-00767 (LBS), 2003 WL 22882137, at *5 (S.D.N.Y. Dec. 4,

2003), and then quoting *Weingrad v. Telepathy, Inc.*, No. 05-cv-02024 (MBM), 2005 WL 2990645, at *5 (S.D.N.Y. Nov. 7, 2005)), *aff'd*, 774 F. App'x 714 (2d Cir. 2019)).  "The case law makes clear that 'closely related' in this sense is a fairly strict standard."  *Id.*  "The enforcement of the forum selection clause against the non-party must have been foreseeable prior to suit, which implies that the non-signatory must have been otherwise involved in the transaction in some manner." *Recurrent Cap. Bridge Fund I, LLC v. ISR Sys. & Sensors Corp.*, 875 F. Supp. 2d 297, 306 (S.D.N.Y. 2012).

Plaintiffs have not sufficiently pled that Reilly's interests are "'completely derivative' of and 'directly related to'" those of a signatory.  *Miller*, 291 F. Supp. 3d at 523.  "The vast majority of cases that have found a non[-]signatory bound by a forum selection clause under the theory that they are 'closely related' to the dispute or the signatory, have done so where the non-signatory had a far more active role in the transaction."  *Id.* at 524 (quoting *Leviton Mfg. Co. v. Reeve*, 942 F. Supp. 2d 244, 259 (E.D.N.Y. 2013)).  Here, Plaintiffs do not allege that Reilly was involved in the negotiations pertaining to the initial DatPiff Agreement or that he had any role in the Agreement's drafting.  Plaintiffs make only the cursory assertion that Reilly was "aware of the terms of the [DatPiff Agreement] and the exclusive forum selection provision therein" and "therefore was on notice that his actions could result in him being named as a party in this forum."  FAC ¶ 10.  But Reilly's awareness of the forum selection provision is not sufficient to establish that it should have been "foreseeable" to him that he would be personally subject to that provision, especially with respect to a claim brought against him by Idle and not by CMG (the counterparty to the DatPiff Agreement).  *Arcadia Biosciences, Inc. v. Vilmorin & Cie*, 356 F. Supp. 3d 379, 395 (S.D.N.Y. 2019) (a non-signatory is closely related to a signatory if "enforcement of the forum selection clause is foreseeable by virtue of the relationship between the signatory and the [non-signatory] sought to

24

be bound" (alteration in original) (quoting *Metro-Goldwyn-Mayer Studios Inc. v. Canal & Distrib. S.A.S.*, No. 07-cv-02918 (DAB), 2010 WL 537583, at \*5 (S.D.N.Y. Feb. 9, 2010))).[5]

Plaintiffs' cited cases are distinguishable and therefore do not compel a contrary conclusion. In *Recurrent Capital*, the court found that a non-signatory — a shareholder and officer in the signatory-company — was "closely related" based on his extensive involvement in the signatory-company's fundraising efforts, which resulted in the Subscription Agreement at issue.  875 F. Supp. 2d at 310-11.  The court stressed that the non-signatory was positioned to obtain "unique and significant personal benefits particular to [him]" from the financing agreement that the Subscription Agreement was intended to facilitate.  *Id.* at 311.  Plaintiffs here have not pled any facts suggesting that, at the time of the DatPiff Agreement's formation, Reilly stood to gain "unique and significant personal benefits" from the licensing arrangement.  As for *Diamond v. Calaway*, the non-signatory defendant in that matter was the signatory's wife and played an "important role" in facilitating her husband's fraudulent scheme against Plaintiff.  No. 18-cv-03238 (KPF), 2018 WL 4906256, at \*5 (S.D.N.Y. Oct. 9, 2018).   Because the signatory-husband was the individual principally responsible for executing the fraud, the non-signatory's involvement in any scheme was "completely derivative of . . . if not predicated upon" whether her husband in fact perpetrated fraud, *id.* at \*4 (quoting

---

[5] Moreover, at least some courts have declined to enforce mandatory forum selection clauses against non-signatory defendants when those defendants object to the exercise of personal jurisdiction.  *See, e.g.*, *Arcadia Biosciences*, 356 F. Supp. 3d at 395 (declining to extend forum selection clause to non-signatory defendant where there was no other connection between the defendant and New York); *Mersen USA EP Corp. v. TDK Elecs. Inc.*, 594 F. Supp. 3d 570, 583-84 (S.D.N.Y. 2022) (applying *Arcadia Biosciences* and declining to apply forum selection clause against non-signatory defendant where plaintiff did "not contend that [defendant] has *any* contacts with New York" ); *Beskrone v. Berlin*, 656 F. Supp. 3d 496, 513-14 (S.D.N.Y. 2023) (similar).  In so holding, these courts have stressed that a plaintiff must still "make a baseline showing that the defendant has 'certain minimum contacts with [the forum] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice.'"  *Arcadia Biosciences*, 356 F. Supp. 3d at 395 (alteration in original) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)).  Although the Court does not decide Reilly's personal jurisdiction motion, Reilly has a colorable claim that weighs against enforcing the forum selection.

*Cuno, Inc. v. Hayward Indus. Prods., Inc.*, No. 03-cv-03076 (MBM), 2005 WL 1123877, at *6

(S.D.N.Y. May 10, 2005)); therefore, it was "reasonably foreseeable to her" that she would be

named as a coconspirator, *id.* at *5.  *See also Roby v. Corp. of Lloyd's*, 996 F.2d 1353, 1360 (2d Cir.

1993) (extending forum selection and choice of law clauses to employees where the "complaints

against [them were] completely dependent on the complaints against the [principals]").  Reilly's

liability is not dependent on CMG's liability.  Therefore, neither *Calaway* nor *Recurrent Capital* is

controlling.

　　As a result, the DatPiff Agreement's mandatory forum selection clause does not apply to the

parties and claims in this matter.

### 2.  The Dispensary Agreement between CMG and Dispensary

　　Plaintiffs assert that if the Court rejects that the DatPiff Agreement included the Dispensary

Content or that the parties modified the terms of the DatPiff Agreement — which it has — a

separate agreement between CMG and Dispensary (the "Dispensary Agreement") contained the

same terms as the DatPiff Agreement, including its mandatory forum selection clause.  FAC ¶¶ 97-

98.  For the reasons set forth below, the Court likewise rejects this argument.

　　The FAC asserts that a "valid and enforceable agreement between Dispensary and CMG

regarding the Dispensary Content was entered into."  *Id.* ¶ 97.  Specifically, the FAC alleges that

"[i]n or around 2018, pursuant to the [DatPiff] Agreement, Dispensary, a wholly owned subsidiary

of Idle, began providing CMG with content it owned (i.e. the Dispensary Content) under the same

terms as the [DatPiff] Agreement, which Dispensary intended CMG to distribute[] under the same

terms as the [DatPiff] Agreement."  *Id.* ¶ 98.  Plaintiffs pleaded that the Dispensary Agreement's

terms incorporated CMG's rights and obligations under the DatPiff Agreement, including an

obligation to make royalty payments amounting to 80 percent of the net revenue.  *Id.* ¶¶ 103-104.

Plaintiffs do not allege that there is a written instrument memorializing the agreement and their

papers assume that any agreement between CMG and Dispensary was made orally. *See* Dkt. 48 at 21. In the alternative, the FAC asserts that there is an implied-in-fact agreement between Dispensary and CMG, as evinced by the parties' "conduct pursuant to the Agreement, Idle, Dispensary, and CMG's course of dealing, their course of performance and the facts and circumstances surrounding their business relationship." FAC ¶ 139.

"The elements of contract formation are: (1) offer, (2) acceptance, (3) consideration, (4) mutual assent, and (5) mutual intent to be bound." *OTG Brands, LLC v. Walgreen Co*., No. 13-cv-09066 (ALC), 2015 WL 1499559, at *6 (S.D.N.Y. Mar. 31, 2015) (citing *Register.com, Inc. v. Verio, Inc*., 356 F.3d 393, 427 (2d Cir. 2004)). "An agreement stems from 'a manifestation of mutual assent sufficiently definite to assure that the parties are truly in agreement with respect to all material terms.'" *McCabe v. ConAgra Foods, Inc*., 681 F. App'x 82, 84 (2d Cir. 2017) (summary order) (quoting *Express Indus. & Terminal Corp. v. N.Y. State Dep't of Transp.*, 715 N.E.2d 1050, 1053 (N.Y. 1999)); *see also Benicorp Ins. Co. v. Nat'l Med. Health Card Sys., Inc*., 447 F. Supp. 2d 329, 337 (S.D.N.Y. 2006) ("The fundamental basis of a valid, enforceable contract is a meeting of the minds of the parties, and, if there is no meeting of the minds on all essential terms, there is no contract." (citing *Schurr v. Austin Galleries*, 719 F.2d 571, 576 (2d Cir. 1983))).

The standard is even more demanding when an oral agreement is alleged. "Where a plaintiff alleges the existence of an oral agreement, it 'faces a heavier burden: 'To ensure that parties are not trapped into surprise contractual obligations that they never intended, more than agreement on each detail is required, there must be an overall agreement to enter into the binding contract.'" *D3 Int'l, Inc. v. AGGF Cosmetic Grp. S.P.A.*, No. 21-cv-06409 (LJL), 2023 WL 2390552, at *7 (S.D.N.Y. Mar. 7, 2023) (quoting *Delaney v. Bank of Am. Corp.*, 908 F. Supp. 2d 498, 514 (S.D.N.Y. 2012), *aff'd*, 766 F.3d 163 (2d Cir. 2014)). As for an implied-in-fact contract, such a contract "may result as an inference from the facts and circumstances of the case, although not formally stated in words,

and is derived from the presumed intention of the parties as indicated by their conduct." *Beth Israel Med. Ctr. v. Horizon Blue Cross & Blue Shield of N.J., Inc.*, 448 F.3d 573, 582 (2d Cir. 2006) (quoting *Jemzura v. Jemzura*, 330 N.E.2d 414 (N.Y. 1975)). "[P]laintiffs need not plead an implied contract's precise terms to survive a motion to dismiss." *Wallace v. Health Quest Sys., Inc*., No. 20-cv-00545 (VB), 2021 WL 1109727, at *10 (S.D.N.Y. Mar. 23, 2021).

The Court need not decide whether Plaintiffs have adequately pleaded that the contract between Dispensary and CMG was an oral agreement or an implied-in-fact contract. In either case, they have not pleaded mutual assent *to a forum selection clause*. Plaintiffs make only the conclusory assertion that "[i]n or around 2018," Dispensary "began providing CMG with . . . the Dispensary Content . . . under the same terms as the [DatPiff] Agreement, which *Dispensary intended CMG to distribute[] under the same terms as the [DatPiff] Agreement*." FAC ¶ 98 (emphasis added). With respect to the parties' alleged implied contract, Plaintiffs assert that the parties' course of conduct included "Dispensary supplying CMG with . . . the Dispensary Content, and CMG paying eighty (80%) of the Net Revenue derived from the distribution of the Dispensary Content every month, *along with other provisions including the choice of law, jurisdiction, and venue clause*." FAC ¶ 140 (emphasis added). Beyond these conclusory assertions, Plaintiffs have not pleaded any facts from which this Court might plausibly infer that CMG intended to be bound by the forum selection clause of the DatPiff Agreement with respect to the license of the Dispensary Content. *See Soley v. Wasserman*, 823 F. Supp. 2d 221, 231 (S.D.N.Y. 2011) (no contract where there were no allegations of "specific interactions between [plaintiff and defendant] that would establish those specific terms and demonstrate the parties' intent to be bound by those terms"). The DatPiff Agreement involved a different counterparty (Idle) and different intellectual property (the DatPiff Content), and the Court therefore declines to find that all of its terms were adopted with respect to a contract between Dispensary and CMG regarding the distribution of the Dispensary

Content. While partial performance can show mutual assent, *R.G. Grp., Inc. v. Horn & Hardart Co.*, 751 F.2d 69, 75-76 (2d Cir. 1984), here, the parties' performance at most evinces that Dispensary may have agreed to license its rights to the Dispensary Content in exchange for monthly royalty payments from CMG, not that there was mutual agreement to a forum selection clause.

Therefore, the Court finds that Plaintiffs have not sufficiently pleaded that, even if there was a contract between Dispensary and CMG, they mutually agreed that the choice of law, jurisdiction, and venue clauses contained in the DatPiff Agreement applied to that contract.

## II.    Analysis of CMG's Motion to Transfer

Having determined that there is no mandatory forum selection clause that binds the parties with respect to the claims asserted in this litigation, the Court returns to an analysis of the appropriateness of transfer under 28 U.S.C. § 1404.

The first inquiry under 28 U.S.C. § 1404(a) — whether venue lies in the proposed transferee court — is readily satisfied here. An action "might have been brought" in another forum if "subject matter jurisdiction, personal jurisdiction, and venue would have . . . been proper in the transferee court at the time the action was filed." *Ivy Soc'y Sports Grp., LLC v. Baloncesto Superior Nacional*, No. 08-cv-08106 (PGG), 2009 WL 2252116, at *3 (S.D.N.Y. July 8, 2009). This action could have been brought in the Central District of California. Venue is proper in a "judicial district in which any defendant resides, if all defendants are residents of the State in which the district is located." 28 U.S.C. § 1391(b)(1). CMG's principal place of business is located in, and Reilly is a resident of, Los Angeles County, California. FAC ¶¶ 15, 20. That is sufficient to establish venue and general jurisdiction over the parties in the Central District of California. *See Daimler AG v. Bauman*, 571 U.S. 117, 137 (2014) (observing that "the paradigm forum for the exercise of general jurisdiction" is an individual's domicile and a corporation's principal place of business (quoting *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 924 (2011))). Plaintiffs' primary

basis for disputing the ability to bring suit in the Central District of California is based on the parties' forum selection clauses, *see* Dkt. 48 at 9, which the Court has already deemed inapplicable to the claims asserted here.

The Court therefore considers whether transfer would constitute an appropriate exercise of discretion.  The Court finds that, on balance, the relevant factors — as set forth above — weigh in favor of transfer to the Central District of California.

### 1.  The Convenience of the Witnesses

"The convenience of witnesses is an important consideration, and has often been described as the single most important 1404(a) factor."  *Everlast*, 928 F. Supp. 2d at 743; *accord Nuss v. Guardian Life Ins. Co.*, No. 20-cv-09189 (MKV), 2021 WL 1791593, at *4 (S.D.N.Y. May 5, 2021).  "Generally, the movant 'must clearly specify the key witnesses to be called and must make a general statement of what their testimony will cover.'"  *Nuss*, 2021 WL 1791593, at *4 (quoting *Factors Etc., Inc. v. Pro Arts, Inc*., 579 F.2d 215, 218 (2d Cir. 1978), *abrogated on other grounds by Pirone v. MacMillan, Inc*., 894 F.2d 579, 585-86 (2d Cir. 1990)).  However, "where the movant 'seeks a transfer "on account of" several factors,' his failure to specify key witnesses and their testimony is not fatal."  *Id.* (quoting *Beckerman v. Heiman*, No. 05-cv-05234 (BSJ), 2006 WL 1663034, at *5 (S.D.N.Y. June 16, 2006)).

Here, CMG has indicated that central witnesses in this case will be CMG "executives and employees who worked and communicated with Reilly, and who can testify to CMG's processes for collecting and distributing revenues."  Dkt. 34-1 at 6; *see* Strauss. Decl. ¶ 23; *cf. Mohamed v. Tesfaye*, No. 18-cv-08469 (JSR), 2019 WL 1460401, at *5 (S.D.N.Y. Jan. 24, 2019) (convenience of witnesses weighed in favor of transfer to the Central District of California where "[i]n all likelihood, the most central witnesses in th[e] case . . . all reside[d] in California").  Plaintiffs' assertion that "CMG fails to meet its burden of providing any statement of what their [witnesses']

testimony will cover," Dkt. 48 at 10, misconstrues the record. CMG need only provide a "general statement" and has done so here. *Nuss*, 2021 WL 1791593, at *4. In any event, because CMG moves to transfer based on several factors — including because the locus of operative facts is in no way related to the Southern District of New York — any failure to specify the key testimony witnesses' testimony is not dispositive. *See id.*

Ordinarily, "convenience to non-party witnesses is accorded more weight than that of party witnesses." *Royal & Sun All. Ins., PLC v. Nippon Express USA, Inc.*, 202 F. Supp. 3d 399, 406 (S.D.N.Y. 2016). Plaintiffs, however, have not identified any non-party witnesses that reside in New York. Instead, Plaintiffs point to the fact that their headquarters are located in Pennsylvania and that at least three of their witnesses reside in Pennsylvania, including Idle CEO Marcus Frasier. Dkt. 49 ("Frasier Decl.") ¶¶ 7-8. But for purposes of an analysis of a motion to transfer, "the Court 'dismisses from consideration the convenience of witnesses who are located outside both the current and transferee forums.'" *Bristol-Myers Squibb Co. v. Andrx Pharms., LLC*, No. 03-cv-02503 (SHS) 2003 WL 22888804, at *3 (S.D.N.Y. Dec. 5, 2003) (quoting *Wechsler v. Macke Int'l Trade, Inc.*, No. 99-cv-05725 (AGS), 1999 WL 1261251, at *6 (S.D.N.Y. 1999)); *see also Eres N.V. v. Citgo Asphalt Refining Co.*, 605 F. Supp. 2d 473, 480 (S.D.N.Y. 2009) ("The convenience of witnesses who reside in neither the current nor the transferee forum is not relevant when considering a motion to transfer venue."). Therefore, the convenience of Plaintiffs' witnesses located in Pennsylvania is irrelevant. As Plaintiffs have not identified any witnesses in New York that would inconvenienced by transfer to the Central District of California, this factor weighs in favor of transfer.

### 2. The Convenience of the Parties

"When analyzing the convenience of the parties, courts generally look to the parties' principal place of business, the location of their offices, or their residences." *Nuss*, 2021 WL 1791593, at *5. "In assessing convenience of the parties, courts compare the hardships defendant

31

would suffer through the retention of jurisdiction and the hardships the plaintiff would suffer from the transfer of the action to the transferee district." *Id.* "This factor generally 'favors transfer when transfer would increase convenience to the moving party without generally increasing the inconvenience to the non-movant.'" *Id.* (quoting *Liberty Mut. Ins. Co. v. Fairbanks Co*., 17 F. Supp. 3d 385, 399 (S.D.N.Y. 2014)). This factor is neutral, however, when "transferring venue would merely shift the inconvenience to the other party." *AIG Fin. Prods. Corp. v. Pub. Util. Dist. No. 1 of Snohomish Cnty*., 675 F. Supp. 2d 354, 370 (S.D.N.Y. 2009) (quoting *Beatie & Osborn LLP v. Patriot Sci. Corp.*, 431 F. Supp. 2d 367, 396 (S.D.N.Y. 2006)).

Transfer would plainly convenience the Defendants, who are headquartered and reside in Los Angeles County, California. FAC ¶¶ 15, 20. Plaintiffs, however, are located in Pennsylvania and would therefore be inconvenienced by a transfer to the Central District of California. *Id.* ¶¶ 12-13. Because transferring venue would "merely shift the inconvenience," *Liberty Mut. Ins. Co*., 17 F. Supp. 3d at 399 (citation omitted), the Court finds this factor to be neutral.

### 3. The Locus of Operative Facts

"The location of the operative events is a 'primary factor' in determining a § 1404(a) motion to transfer." *Smart v. Goord*, 21 F. Supp. 2d 309, 316 (S.D.N.Y. 1998) (quoting *800-Flowers, Inc. v. Intercontinental Florist, Inc*., 860 F. Supp. 128, 134 (S.D.N.Y. 1994); *Morales v. Navieras de Puerto Rico*, 713 F. Supp. 711, 712 (S.D.N.Y. 1989)). "In determining the locus of operative facts, courts look to the 'site of events from which the claim arises.'" *Oubre v. Clinical Supplies Mgmt*., No. 05-cv-2062, 2005 WL 3077654, at *2 (S.D.N.Y. Nov. 17, 2005) (quoting *800-Flowers*, 860 F. Supp. at 134). "A cause of action arises from the defendant's activities in the state 'if there is an articulable nexus, or a substantial relationship, between the claim asserted and the actions that occurred in New York.'" *AIG Fin. Prods. Corp*., 675 F. Supp. 2d at 365 (internal quotation marks omitted) (quoting *Best Van Lines, Inc. v. Walker*, 490 F.3d 239, 246 (2d Cir.

2007)).  "A breach of contract claim arises from facts related to the formation, performance, or breach of a contract."  *Id.* at 370.  "Where there is no material connection between the district and the operative facts, . . . the interests of justice require the transfer of [the] action."  *Indian Harbor Ins. Co. v. Factory Mut. Ins. Co.*, 419 F. Supp. 2d 395, 405 (S.D.N.Y. 2005) (alterations and omissions in original) (quoting *Manao Invs., Inc. v. Stouts Brunswick Assocs.*, No. 96-cv-07100 (HB), 1997 WL 53200, at *2 (S.D.N.Y. Feb. 10, 1997)).

It is clear from the pleadings and affidavits that this action has little to no connection to New York.  Plaintiffs make only the cursory assertion that "[t]he Dispensary Content . . . that is the subject of this lawsuit" was "distributed to and consumed by consumers within this judicial district."  FAC ¶ 7.  The Court gives this assertion little weight.  Plaintiffs do not allege that Defendants targeted or specifically directed services toward consumers in New York, and the streaming services over which the Dispensary Content was distributed, including YouTube, Spotify, Apple Music, and iTunes, operate across jurisdictions.  Moreover, as noted *supra*, the core of Plaintiffs' breach of contract and related state law claims is Reilly's financial misconduct and CMG's facilitation thereof in breach of its payment obligations, not the distribution of the Dispensary Content.  CMG is headquartered in the Central District of California, FAC ¶ 15, and Reilly is a resident of Los Angeles County and performs his job duties from California, Dkt. 44 ("Reilly Decl.") ¶¶ 2-4.  CMG represents that it "did not collect funds or distribute funds in connection with the DatPiff Agreement or Dispensary [C]ontent in New York," Strauss Decl. ¶ 21, and that all of its "funds from the monetization of music and digital assets are deposited in its banks in California," *id.* ¶ 22.  "All of CMG's C-level executives" are located in California.  *Id.* ¶ 19.  Reilly states that he has never received or sent any money "from any bank account owned and/or operated by" himself, Idle, the Dispensary, or CMG that is located in New York.  Reilly Decl. ¶ 4.

He also represents that he has "never visited" any CMG employees in New York for business or otherwise. *Id.*

Frasier, Idle's CEO, disputes that Reilly resided in California during the entirety of his employment with Idle, alleging instead that Reilly lived in Delaware before "moving to California in or about 2020." Dkt. 57 ¶ 10. Even resolving this factual dispute in Plaintiffs' favor, *In re Optimal U.S. Litig.*, 813 F. Supp. 2d at 373, Plaintiffs seek Dispensary Revenues through 2022, Gipson Decl. at 4. Reilly therefore resided in California for at least some duration of the underlying events. In any event, it is undisputed that Reilly never resided in New York.

Given the lack of an articulable nexus between the operative facts alleged here and the Southern District of New York, this factor strongly favors transfer. *See, e.g., Enigma Software Grp. USA, LLC v. Malwarebytes Inc.*, 260 F. Supp. 3d 401, 410 (S.D.N.Y. 2017) (finding that this factor "substantially favors transfer from this district when a party 'has not shown that any of the operative facts arose in the Southern District of New York'" (citation omitted)); *Berman v. Informix Corp.*, 30 F. Supp. 2d 653, 658 (S.D.N.Y. 1998) (the locus of operative facts was in the Northern District of California when defendant was headquartered there and the "statements that form the basis of plaintiff's claims originated there").

### 4. The Location of Documents and Sources of Proof

Defendants allege that CMG's headquarters are located in California and that most of its books and records, including its financial records, are located in California. Strauss Decl. ¶ 23. However, as Plaintiffs note, courts give this factor less relevance in "today's world of faxing, scanning, and emailing documents." *AIG Fin. Prods. Corp.*, 675 F. Supp. 2d at 370 (quoting *Am. S.S. Owners Mut. Prot. & Indem. Ass'n v. Lafarge N. Am., Inc.*, 474 F. Supp. 2d 474, 484 (S.D.N.Y. 2007)); *Nuss*, 2021 WL 1791593, at *5 ("Courts . . . generally treat this factor as neutral absent a showing of particular relevance to the case."). Given that CMG's distribution of Dispensary's

assets was through digital-streaming websites, and that CMG's payment of royalties was through its online Client Web Portal, the Court deems this factor neutral.

### 5.  The Relative Means of the Parties

The relative means of the parties is neutral.  Neither CMG nor Idle "has submitted any evidence or documentation detailing significant financial disparities, nor has either party alleged that transferring the case . . . would be 'unduly burdensome to their finances.'"  *Nuss*, 2021 WL 1791593, at * 8 (citation omitted).  While Reilly claims that he would "experience significant hardship" if this action remains in the Southern District of New York, including "with respect to the costs of travel and lodging" for himself and his lead counsel, Dkt. 44 ¶ 8, he has provided no further information or documentation from which this Court could infer undue financial hardship.

### 6.  The Forum's Familiarity with the Law

As noted *supra*, the Court finds that Plaintiffs have not sufficiently pleaded mutual assent to the DatPiff Agreement's choice of forum or choice of law provisions.  There is therefore no choice of law clause that binds the parties and claims in this action.

"Federal courts sitting in diversity apply the choice of law rules of the forum state."  *Glotser v. Boardwalk Regency LLC*, No. 20-cv-02654 (JPC), 2023 WL 2162063, at *6 (S.D.N.Y. Feb. 22, 2023).  "Under New York choice of law rules 'the law of the jurisdiction having the greatest interest in the litigation will be applied.'"  *Id*. (quoting *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 672 F.3d 155, 157 (2d Cir. 2012)).  "Interest analysis is a 'flexible approach intended to give controlling effect to the law of the jurisdiction which, because of its relationship or contact with the occurrence or the parties, has the greatest concern with the specific issue raised in the litigation.'"  *Licci*, 672 F.3d at 157-58 (quoting *Fin. One Pub. Co. v. Lehman Bros. Special Fin., Inc*., 414 F.3d 325, 337 (2d Cir. 2005)).  Given that both Defendants are located in California and that Defendant Reilly resided in California for at least a portion of the alleged misconduct, California arguably has

35

the greatest interest in the resolution of this litigation.  Therefore, this factor too weighs in favor of transfer.

### 7. The Availability of Process

Under Federal Rule of Civil Procedure ("Rule") 45(c)(1)(A), a district court generally cannot issue a subpoena that would compel a nonparty witness to travel more than 100 miles from the state "where the person resides, is employed, or regularly transacts business in person."  Fed. R. Civ. P. 45(c)(1).  "Courts generally treat this factor as neutral where there is no indication that nonparty witnesses would refuse to appear."  *Nuss*, 2021 WL 1791593, at *7; *see also Jacobs v. Felix Bloch Erben Verlag fur Buhne Film und Funk KG*, 160 F. Supp. 2d 722, 743 (S.D.N.Y. 2001) ("As the Second Circuit has suggested, the unavailability of compulsory process is a less compelling factor where a defendant has not claimed that its potential witnesses would be unwilling to testify." (citing *Peregrine Myan. Ltd. v. Segal*, 89 F.3d 41, 47 (2d Cir. 1996))).  Defendants have not introduced any evidence indicating that nonparty witnesses are unwilling to testify.  Moreover, the location of Defendants' witnesses has little relevance to the Court's analysis of this factor because Defendants' witnesses are "employees of the parties" and could therefore be compelled to testify without need for a subpoena.  *See, e.g.*, *Eres N.V.*, 605 F. Supp. 2d at 482.  The Court therefore treats this factor neutrally.

### 8. The Plaintiff's Choice of Forum

"The Second Circuit has consistently held that a 'plaintiff's choice of forum is presumptively entitled to substantial deference.'"  *Atl. Recording Corp. v. Project Playlist, Inc.*, 603 F. Supp. 2d 690, 698 (S.D.N.Y. 2009) (quoting *Gross v. BBC*, 386 F.3d 224, 230 (2d Cir. 2004)).  However, "[l]ess deference is given to a plaintiff's choice of forum when the suit is brought in a district where the plaintiff does not reside."  *Savarese v. City of New York*, No. 18-cv-05956 (ER), 2019 WL 2482387, at *4 (S.D.N.Y. June 13, 2019) (citation omitted).

Here, Plaintiffs elected to file suit in the Southern District of New York despite the fact that their headquarters are located in Pennsylvania and notwithstanding the lack of any meaningful nexus between the claims they assert and this District. "Where the plaintiff has chosen a forum that is neither the district of its residence, nor the locus of the operative facts in this case, this choice is given considerably less weight." *Emps. Ins. of Wausau v. News Corp.*, No. 06-cv-01602 (SAS), 2008 WL 4443899, at *3 (S.D.N.Y. Sept. 29, 2008); *accord Anadigics, Inc. v. Raytheon Co.*, 903 F. Supp. 615, 617 (S.D.N.Y. 1995); *Morales v*, 713 F. Supp. 712-13 (S.D.N.Y. 1989).

Moreover, although the Court elects not to decide the merits of Reilly's Rule 12(b)(2) motion for a lack of personal jurisdiction, there is at least a "colorable argument" that the Court lacks personal jurisdiction over Reilly. *Miller-Rich v. Altum Pharms. Inc.*, No. 22-cv-03473 (JLR), 2024 WL 1638637, at *10 (S.D.N.Y. Apr. 16, 2024). For this reason, too, less deference is given to Plaintiff's choice of forum. *See, e.g.*, *id.* (affording less deference to plaintiff's choice of forum where defendant advanced a "colorable argument that the Court lacks personal jurisdiction over him"). "[T]he potential litigation concerning personal . . . jurisdiction 'in and of itself weighs against deferring to the plaintiff's choice of forum.'" *Wamai v. Indus. Bank of Kor.*, No. 21-01956, 2023 WL 2395675 (2d Cir. Mar. 8, 2023) (summary order); *see also Kingstown Cap. Mgmt., L.P. v. Vitek*, No. 20-03406, 2022 WL 3970920, at *3 (2d Cir. Sept. 1, 2022) (summary order) ("[T]he district court also rightly noted that . . . the parties dispute whether the district court even has personal jurisdiction over all Defendants . . . ."). This factor therefore weighs in favor of transfer.

### 9.  Trial Efficiency and the Interests of Justice

Finally, the Court considers whether transfer to the Central District of California would promote judicial economy and the interests of justice. "The usual concern with judicial economy when considering a transfer motion is whether transfer would require a new court to familiar itself with the facts of the case." *Mohamed*, 2019 WL 1460401, at *6 (quoting *Khankhanian v. Khanian*,

No. 16-cv-08396 (JFK), 2017 WL 1314124, at *7 (S.D.N.Y. Apr. 6, 2017)).  "[C]ourts generally find that the farther along a case is in the litigation process, the less efficient a transfer would be." *Starr Indem. & Liab. Co. v. Brightstar Corp.*, 324 F. Supp. 3d 421, 441 (S.D.N.Y. 2018).

On the one hand, this Court necessarily engaged with some of the facts and the merits of Plaintiffs' claims to resolve the transfer motion, which weighs "somewhat in favor of retaining this action." *Prokos v. Haute Living, Inc.,* No. 19-cv-00138 (PGG), 2020 WL 4677375, at *7 (S.D.N.Y. Aug. 11, 2020) ("Judicial economy weighs somewhat in favor of retaining this action" where the "[c]ourt has become familiar with the facts of the case in connection with addressing the instant motion to dismiss or transfer.").  The Court also agrees with Plaintiffs that the Central District of California likewise faces a congested docket.  Dkt. 48 at 13.  However, this is the first dispositive motion that has come before this Court.  The parties are in discovery proceedings but, due to various discovery disputes, have sought an extension of discovery deadlines through April 2025. Dkt. 108.  Trial has not yet been scheduled in this matter, and the parties' post-discovery, pre-motion conference is not scheduled until May 21, 2025.  *Id.*  The Court finds that, given the still relatively early procedural posture of the case, transfer would not impede judicial economy or trial efficiency.  *See, e.g.*, *RBG Mgmt. Corp. v. Vill. Super Mkt., Inc*., No. 22-cv-07996 (JLR), 2024 WL 1574026, at *6 (S.D.N.Y. Apr. 11, 2024) (affirming transfer where the parties had engaged in "limited discovery," had not yet filed summary judgment motions, and had not yet set a trial date); *Federman Assocs. v. Paradigm Med. Indus. Inc*., No. 96-cv-08545 (BSJ), 1997 WL 811539, at *5 (S.D.N.Y. Apr. 8, 1997) (transferring case even though fact discovery was due at the end of the following month because "transfer . . . would facilitate discovery in the district where the majority of witnesses reside, documents are located, and locus of operative facts took place").

Moreover, as noted *supra*, "transfer would further the interests of justice because it is unclear whether this Court can exercise personal jurisdiction over the defendants here," particularly

Defendant Reilly. *WellQuest Int'l, Inc. v. Genesis Intermedia.com, Inc.*, No. 00-cv-06558 (RCC), 2001 WL 1246592, at *6 (S.D.N.Y. Oct. 18, 2001); *Worldwide Futgol Assocs., Inc. v. Event Ent.*, 983 F. Supp. 173, 182 (E.D.N.Y. Nov. 10, 1997) (holding that the "mere appearance of a colorable jurisdictional issue may be a factor in a court's decision to transfer venue under 28 U.S.C. § 1404(a)").

*    *    *

Having considered the relevant factors, the Court concludes that transfer to the Central District of California is appropriate. The only connection between this case and New York were the mandatory forum selection clauses in the DatPiff Agreement and CMG's Disclaimer. Having determined that those clauses do not apply to the parties or claims asserted here, any basis for retaining this action in New York has now fallen away. No parties or witnesses are located in New York, no relevant actions transpired in New York, and Defendants and the majority of witnesses are in the Central District of California. Where, as here "there is 'no material connection between this district and the operative facts, . . . the interests of justice require the transfer of [the] action.'" *Bunn v. Dash*, No. 19-cv-11804 (MKV), 2020 WL 4586790, at *5 (S.D.N.Y. Aug. 10, 2020) (quoting *Brown v. Dow Corning Corp.*, No. 93-cv-05510 (AGS), 1996 WL 257614, at *2 (S.D.N.Y. May 15, 1996)); *see also Bordiga v. Dirs. Guild of Am.*, 159 F.R.D. 457, 462 (S.D.N.Y. 1995) ("Courts routinely transfer cases when the principal events occurred, and the principal witnesses are located, in another district." (quoting *Arrow Elecs., Inc. v. Ducommun Inc.*, 724 F. Supp. 264, 266 (S.D.N.Y. 1989))).

**CONCLUSION**

For the reasons set forth above, the Court therefore GRANTS CMG's motion to transfer this case to the Central District of California. Reilly's motions to dismiss for improper venue and lack of jurisdiction are rendered MOOT.

39

The Clerk of Court is respectfully directed to TRANSFER this case to the Central District of California.

Dated: December 6, 2024        SO ORDERED.
       New York, New York

_____
JENNIFER L. ROCHON
United States District Judge